[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-10834

_____

RICHARD CHRISTOPHER JOHNSON,

Plaintiff-Appellant,

versus

CITY OF MIAMI BEACH,
CHRISTOPHER AGUILA,

Defendants-Appellees.

———————————————

Appeal from the United States District Court
for the Southern District of Florida

D.C. Docket No. 1:18-cv-23925-AHS

———————————————

Before WILSON, ROSENBAUM, and HULL, Circuit Judges.

HULL, Circuit Judge:

Plaintiff-Appellant Richard Johnson appeals the district court's order granting summary judgment in favor of Defendants-Appellees Officer Christopher Aguila, individually, and the City of Miami Beach on Johnson's claims of excessive force and state law battery. Because the district court found that Officer Aguila's conduct was not excessive force or a battery, the district court granted summary judgment on that basis alone.

Under Johnson's version of events, Johnson's arrest was effected and he was fully secured, not resisting, and not posing a threat when Officer Aguila gratuitously and forcibly struck him in his face. After review of the evidence and videos in the light most favorable to Johnson, and with the benefit of oral argument, we conclude that the district court erred in granting summary judgment in favor of the Defendants. Therefore, we reverse.

## I.    BACKGROUND

In this case, some of the events were captured on officers' body cameras and security cameras within the Miami Beach Police Department. We review *de novo* the videotape evidence that was presented to the district court at the summary judgment stage. *See Scott v. Harris*, 550 U.S. 372, 380-81, 127 S. Ct. 1769, 1776 (2007); *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1290 n.3 (11th Cir. 2009). Where no video exists or where the videos do not answer all the questions or resolve all the details of the encounter, we view the evidence in the light most favorable to Johnson. *See Cantu v. City of Dothan*, 974 F.3d 1217, 1226-27 (11th Cir. 2020).

The facts at the summary judgment stage are not necessarily the true, historical facts or what a jury may ultimately find. Instead, the facts at this stage are what a reasonable jury could find from the evidence and the videos viewed in the light most favorable to the non-moving party, Johnson in this case. *See id.* at 1222; *Scott*, 550 U.S. at 378, 127 S. Ct. at 1774-75.

### A.  Johnson Is Arrested

Early in the morning on March 24, 2017, Johnson sold $80 worth of cocaine to two undercover Miami Beach police officers. He then walked into a nearby smoke shop, and two uniformed officers followed to apprehend him. One officer grabbed Johnson's arm from behind and began to handcuff him. Johnson, not realizing it was a police officer who had grabbed him, tried to pull

away. In doing so, he bumped into a shelf and knocked over several glass hookah pipes, which shattered.

Body camera footage from a third officer to arrive on the scene shows the two officers escorting Johnson out of the smoke shop and, with the help of a fourth officer, placing him in handcuffs. As those four officers walked Johnson to the curb, Defendant Aguila and a sixth officer approached. For about seven minutes after that, the officers searched Johnson's person and his possessions before placing him in a transport vehicle.

When the officers walked Johnson to the transport vehicle and told him to have a seat, Johnson did not immediately comply and said that he was not going to jail. An officer told him he was resisting arrest by not taking a seat, and Defendant Aguila told Johnson to have a seat or he would dislocate his shoulder. Johnson sat down.

During the seven minutes that Defendant Aguila was present at the scene of the arrest, Johnson repeatedly asked the officers why he was being arrested, insisted he had done nothing wrong, and accused them of setting him up. While Johnson was talkative, he was not physically aggressive. He did not immediately follow the order to sit down in the police vehicle, but after 20 or so seconds, he sat down in the vehicle.

## B. Johnson Is Taken to the Police Department

While driving Johnson to the Miami Beach Police Department, Officer Duane Mitchell called for backup to meet him

at the police station, explaining over the radio that Johnson had "said he isn't going." Defendant Aguila responded to the call and met Mitchell at the police station. Mitchell told Aguila that Johnson did not want to get out of the police car. Defendant Aguila opened the door of the car, and Johnson got out six seconds later. Aguila then walked Johnson, still handcuffed, into the police station for processing.

Inside the police station, officers at some point removed Johnson's handcuffs. Body camera footage shows Johnson, no longer in handcuffs, continuing to ask why he had been arrested and insisting that he did nothing wrong. At one point, facing Aguila, Johnson stated, "I ain't scared of you by a long shot, buddy." Nonetheless, the videos show that Johnson complied with the officers' instructions to take off his socks and shoes and then to turn around and place his hands on the table behind him. At that point, six officers, including Aguila, were standing around Johnson. Of the five visible on camera, all were taller than Johnson, and four were much larger than he was.

After an officer searched Johnson's shoes and socks, the entire group began to walk toward a holding cell. Johnson was not handcuffed as he walked over to the holding cell. None of the six officers held, restrained, or touched Johnson during the short walk to the cell.

### C.  Aguila Forcibly Strikes Johnson

When the group reached the holding cell, Officer Walter Mejia placed his hand on Johnson's back and guided him toward the open doorway of the cell.  Johnson initially walked with him to the cell's doorway, but then stepped to the right of the cell's doorway and placed his back against the adjacent wall, stating, "I'm not going to go in there."  Another officer immediately said, "My man, my man, you're going in there," and Johnson made no further remarks to the officers.  With his right arm, Mejia (now directly in front of the cell's doorway) grabbed Johnson by the shoulder and then pushed him into the cell.  At this point, Johnson was inside the cell and Mejia, who had never entered the cell, remained outside of the cell.

 After Johnson was inside the cell, Officer Mejia took a step to the left, such that he was no longer directly in front of the cell's doorway, and reached for the cell's sliding door with his left arm.  Johnson was then well inside the cell and standing still.  No other inmate was in the cell.

Although Mejia stepped to the left to close the cell door, Defendant Aguila (who had been standing outside the cell on Mejia's right) took two or three steps forward, came into the cell, and forcibly struck Johnson in the face with his elbow.  The incident was captured, at various angles, on two security cameras and two body cameras.  None of these videos show Johnson making any perceptible movements in the brief interlude between

when Mejia placed him in the cell and when Aguila then entered the cell and forcibly struck Johnson.

In his deposition, Officer Mejia testified that, had Aguila not entered the cell and struck Johnson, Mejia could have closed the door of the cell.[1]  Mejia explained that the "main objective" was to "[g]et the . . . detainee in the cell and close the door behind him."

Johnson was later treated for a small laceration to his mouth.

## II.    PROCEDURAL HISTORY

Johnson filed a complaint against Officer Aguila and the City of Miami Beach, alleging a 42 U.S.C. § 1983 claim of excessive force against Aguila, individually, and claims of state law battery against

---

[1] Specifically, Officer Mejia's testimony was:

Q.  All right.  What stopped you from closing the door?
A.  Well, obviously [Officer Aguila] striked [sic] when he entered and . . . I can't say, you know, what . . . his observation is what caused him to enter . . . and, you know, close the gap.
. . .
Q.  Looking at it now, looking at that video, had Officer Aguila not stepped into the cell, . . . could you have just closed the door and been done with it, had Officer Aguila not entered the cell?
A.   Ultimately, that's the main objective.  Get the—the detainee in the cell and close the door behind him.
Q.   Had Officer Aguila not entered the cell, could you have simply closed it with Mr. Johnson inside and all the officers on the outside?
A.  Sure.

Aguila and the City.    The Defendants moved for summary judgment on all claims.[2]

The district court granted the Defendants' motion, finding that Aguila was entitled to qualified immunity because a reasonable officer could have believed that the force used was necessary under the circumstances.    There was thus no constitutional violation for the § 1983 claim against Aguila.  Next, because the district court determined Aguila did not use excessive force, it concluded that Johnson's state law battery claims, which require a showing that the force used was clearly excessive, also failed.

### III.    SECTION 1983 EXCESSIVE FORCE CLAIM

### A.  Qualified Immunity

We review *de novo* a district court's grant of summary judgment based on qualified immunity.  *Cantu*, 974 F.3d at 1228. In doing so, we resolve all issues of material fact and draw all reasonable inferences in favor of the non-moving party.  *Id.*

Qualified immunity protects government officials performing discretionary functions from civil liability unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known.  *Pearson*

---

[2] Johnson also raised claims against Officers Juan Balciero, Roger Gaitan, and Eugenio Abay, but later jointly stipulated with the Defendants to dismiss these claims with prejudice.

*v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009); *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515 (2002). The parties agree that Officer Aguila was acting within his discretionary authority at all relevant times.

Once an officer has shown that he was acting within the scope of his discretionary authority, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)); *see Brown v. City of Huntsville*, 608 F.3d 724, 734 & n.14 (11th Cir. 2010).

### B. Federal Constitutional Violation

Our first inquiry is whether the facts, taken in the light most favorable to Johnson, show Officer Aguila's conduct violated a federal constitutional right?

The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the right to be free from the use of excessive force in the course of an arrest. *Lee*, 284 F.3d at 1197. In excessive force cases, whether a plaintiff's constitutional rights were violated is governed by the Fourth Amendment's objective reasonableness standard. *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008). Under that standard, we judge the officer's use of force "on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Brown*, 608 F.3d at 738 (quotation marks omitted).

Whether an officer has used excessive force depends on "the facts and circumstances of each particular case," including a non-exhaustive list of factors, such as (1) "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989); *Charles v. Johnson*, __ F.4th __, 2021 WL 5313668, at *7 (11th Cir. Nov. 16, 2021). "Not every push or shove" violates the Fourth Amendment. *Graham*, 490 U.S. at 396, 109 S. Ct. at 1872; *see also Charles*, 2021 WL 5313668, at *7.

This Court has ruled specifically that a police officer violates the Fourth Amendment if he uses gratuitous force against a suspect who is secure, not resisting, and not a safety threat to the officer or other officers. *See, e.g.*, *Hadley*, 526 F.3d at 1330 (holding officer used excessive force when, in a single blow, he punched suspect who was handcuffed and was not struggling or resisting); *Lee*, 284 F.3d at 1199 (holding that an officer's use of force after the plaintiff was "arrested, handcuffed, and completely secure, and after any danger to the arresting officer as well as any risk of flight had passed" was excessive). Conversely, we have held that it may be reasonable for an officer to use force against a suspect who is resisting and not subdued. *See, e.g.*, *Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1351, 1355 (11th Cir. 2015) (concluding officers' use of force in striking, kicking, and tasing suspect was not excessive where the suspect, though pinned on the ground, was

"refusing to surrender his hands to be cuffed"); *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1334-35 (11th Cir. 2004) (concluding officer's use of force was not excessive where suspect, though lying face down on the ground, "was able to wrestle his hand loose and push [the officer's] foot away").

Here, viewing the evidence and the videos in the light most favorable to Johnson, a reasonable jury could find that at the time Aguila entered the holding cell and forcibly struck him, (1) Johnson's arrest was effected; (2) Johnson was fully secured, as he was far enough inside the holding cell that Officer Mejia could have slid the door closed without incident; (3) Johnson was not moving, resisting, or otherwise posing a threat to Mejia or any other officer; (4) Johnson was not attempting to flee; and (5) Defendant Aguila had no need to use any force against Johnson. The *Graham* factors weigh in Johnson's favor. A reasonable jury thus could find that Defendant Aguila used excessive force in violation of the Fourth Amendment when he entered the holding cell and forcibly struck Johnson, who was then secure, not resisting, and not a safety threat to any officers.

The Defendants argue that Johnson was verbally belligerent and non-compliant throughout his arrest and processing, and therefore a reasonable officer in Aguila's position could believe Johnson was a safety threat. But the videos tell a different story. While Johnson was verbally insistent that he did nothing wrong and did not want to go to jail, the videos, in the light most favorable to Johnson, show he never made any threatening movements of

any type toward the officers at the time of the strike or at any point during his processing inside the police station.

The Defendants argue that Johnson was not compliant because he did not immediately sit in or get out of the police car. They ignore that a video at the arrest scene shows Johnson sitting down in the police car about 20 seconds after being told to do so, and almost immediately after Defendant Aguila told Johnson to have a seat or he would dislocate his shoulder. And, at the arrival at the police station, a video shows Johnson got out of the police car six seconds after Defendant Aguila opened the car door. In any event, the videos inside the police station, in the light most favorable to Johnson, reveal that Aguila had no need to use force against Johnson inside the holding cell.

We now turn to the question of whether Johnson's federal constitutional right was clearly established at the time of Defendant Aguila's conduct on March 24, 2017.

## C.  Clearly Established Law

A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11, 136 S. Ct. 305, 308 (2015) (quotation marks omitted). "The usual way of establishing that a constitutional violation was clearly established law is by pointing to a case, in existence at the time, in which the Supreme Court or this Court found a violation based on materially similar facts." *Cantu*, 974 F.3d at 1232. "In the context

of Fourth Amendment excessive force claims, we have noted that generally no bright line exists for identifying when force is excessive; we have therefore concluded that unless a controlling and materially similar case declares the official's conduct unconstitutional, a defendant is usually entitled to qualified immunity." *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000).

In two recent decisions, the Supreme Court reversed the denial of qualified immunity in Fourth Amendment excessive force cases. *City of Tahlequah v. Bond*, 595 U.S. __, __ S. Ct. __, 2021 WL 4822664 (U.S. Oct. 18, 2021); *Rivas-Villegas v. Cortesluna*, 595 U.S. __, __ S. Ct. __, 2021 WL 4822662 (U.S. Oct. 18, 2021). In doing so, the Supreme Court in both decisions emphasized that "specificity is especially important in the Fourth Amendment context, where it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *City of Tahlequah*, 2021 WL 4822664, at *2 (cleaned up) (quoting *Mullenix*, 577 U.S. at 12, 136 S. Ct. at 308); *Rivas-Villegas*, 2021 WL 4822662, at *2 (same). "It is not enough that a rule be suggested by then-existing precedent;" rather, a "rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *City of Tahlequah*, 2021 WL 4822664, at *2 (quotation marks omitted). "[E]xisting precedent must have placed the statutory or constitutional question beyond

14                    Opinion of the Court                    20-10834

debate." *Rivas-Villegas*, 2021 WL 4822662, at *2 (quoting *White v. Pauly*, 580 U.S. __, 137 S. Ct. 548, 551 (2017)).

As explained above, at the time of Defendant Aguila's conduct on March 24, 2017, our circuit case law clearly established that an officer violates the Fourth Amendment when he uses gratuitous force against an arrestee who is fully secured, not resisting arrest, and not posing a safety threat to the officer. *See Hadley*, 526 F.3d at 1330; *Lee*, 284 F.3d at 1198.[3]

In *Hadley*, this Court held that a police officer who punched an arrestee in the stomach used excessive force because the arrestee was handcuffed and not struggling or resisting. *Hadley*, 526 F.3d at 1330. We explained that the officer was "not entitled to use any force" because the arrestee "neither resisted arrest nor posed a danger to [the officer]." *Id.* Similarly, in *Lee*, this Court held that an officer who slammed an arrestee's head against a car used

---

[3] Johnson brought his excessive force claim under the Fourth Amendment, as an arrestee, not the Fourteenth Amendment, as a pretrial detainee. All parties analyzed his claims under the Fourth Amendment in the district court and now in this Court. The parties' appellate briefs reference only the Fourth Amendment and discuss only Fourth Amendment decisions. Thus we need not, and do not, discuss whether Johnson was properly categorized as an arrestee or a pretrial detainee at the time Aguila used force against him in the holding cell. Notably, we have stated: "[I]nasmuch as it entails an inquiry into the objective reasonableness of the officers' actions, . . . the Fourteenth Amendment standard has come to resemble the test that governs excessive-force claims brought by arrestees under the Fourth Amendment." *Patel v. Lanier Cnty.*, 969 F.3d 1173, 1182 (11th Cir. 2020) (quotation marks omitted).

excessive force because the arrest had been effected and the arrestee had not resisted or attempted to flee. *Lee*, 284 F.3d at 1198. There, we stated that any reasonable officer would know that "[o]nce an arrestee has been fully secured, such force is wholly unnecessary to any legitimate law enforcement purpose." *Id.* at 1199.

These cases are binding, materially similar precedent that would put a reasonable officer on fair notice that it was unlawful to strike Johnson after his arrest was effected, he was fully secured inside a holding cell, and he was not resisting or attempting to flee. Specifically, an objectively reasonable officer would have known on March 24, 2017, that it was clearly unlawful to gratuitously and forcibly strike an arrestee who was fully secured, not resisting, not posing a safety threat, and not attempting to flee. *See Hadley*, 526 F.3d at 1330; *Lee*, 284 F.3d at 1198; *City of Tahlequah*, 2021 WL 4822664, at *2.

Accordingly, on the record at this stage and in the light most favorable to Johnson, Defendant Aguila is not entitled to qualified immunity.

## IV.    STATE LAW CLAIMS

As a final matter, because we reverse the district court's grant of summary judgment to Defendant Aguila on Johnson's federal excessive force claim, we also reverse its grant of summary judgment to both Defendants on his state law battery claims. Under Florida law, force used by a police officer during an arrest is

transformed into a battery where the force used was clearly excessive. *See Davis v. Williams*, 451 F.3d 759, 768 (11th Cir. 2006) (citing *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. Dist. Ct. App. 1996)).   And to determine whether the force used was excessive, Florida courts analyze whether the amount of force used was reasonable under the circumstances. *Sanders*, 672 So. 2d at 47. In light of our conclusion that a reasonable jury could find that Aguila used excessive force, we conclude that summary judgment is not warranted on Johnson's state law battery claims.

## V.    CONCLUSION

For the foregoing reasons, we conclude that the district court erred in granting summary judgment to Defendant Aguila on Johnson's § 1983 excessive force claim and to Defendants Aguila and the City of Miami Beach on his state law battery claims.

**REVERSED AND REMANDED.**